IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT HURWITZ, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civ. No. 15-711-SLR |
| LRR ENERGY, L.P., ERIC MULLINS, CHARLES W. ADCOCK, JONATHAN C. FARBER, TOWNES G. PRESSLER, JR., JOHN A. BAILEY, JONATHAN P. CARROLL, VANGUARD NATURAL RESOURCES, LLC, LIGHTHOUSE MERGER SUB, LLC, SCOTT W. SMITH, RICHARD A. ROBERT, W. RICHARD ANDERSON, BRUCE W. MCCULLOUGH, AND LOREN SINGLETARY, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Blake A. Bennett, Esquire of Cooch and Taylor, P.A., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Stephen J. Oddo, Esquire, and Nichole T. Browning, Esquire of Robbins Arroyo LLP, San Diego, California.

Rolin P. Bissell, Esquire, Tammy L. Mercer, Esquire, and Pilar G. Kraman, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware. Counsel for Defendants Vanguard Natural Resources, LLC, Scott W. Smith, Richard A. Robert, Richard Anderson, Bruce W. McCullough, Loren Singletary, and LRR Energy, L.P.

Brock E. Czeschin, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware. Counsel for Eric Mullins, Charles W. Adcock, Jonathan C. Farber, Townes G. Pressler, Jr., John A. Bailey, and Jonathan P. Carroll.

## MEMORANDUM OPINION

Dated: March _13_, 2017
Wilmington, Delaware

**ROBINSON, Senior District Judge**

## I. INTRODUCTION

On April 20, 2015, Vanguard Natural Resources, LLC ("Vanguard") announced

that it would acquire LRR Energy, L.P. ("LRR Energy") and its general partner LRE GP,

LLC in a unit-for-unit transaction with an exchange ratio of 0.55 Vanguard common units

per LRR Energy common unit. To facilitate the transaction, LRR Energy issued a proxy

statement (the "Proxy"), and Vanguard issued a registration statement (the "Registration

Statement"). Plaintiff Robert Hurwitz ("plaintiff"), a former unitholder of LRR Energy,

sued on behalf of himself and all others similarly situated, for violations of sections 11

and 15 of the Securities Act of 1933 (the "Securities Act"), and sections 14(a) and 20(a)

of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9

promulgated thereunder. (D.I. 15) Plaintiff essentially alleges that the Proxy and

Registration Statement failed to disclose that existing debt servicing issues would cause

Vanguard to significantly reduce distributions to unitholders after the acquisition. (D.I.

15 ¶ 6; D.I. 31 at 6)

Currently before the court is defendants' motion to dismiss for failure to state a

claim pursuant to Fed. R. Civ. P. 12(b)(6), and failure to adhere to the heightened

pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). (D.I.

29) The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 (federal question jurisdiction), 15 U.S.C. § 77v (jurisdiction for violations of the

Securities Act), and 15 U.S.C. § 78aa (jurisdiction for violations of the Exchange Act).

For the reasons discussed below, defendants' motion to dismiss is denied.

## II.    BACKGROUND

### A.    The Parties

Before the merger, LRR Energy was a publicly traded limited partnership ("MLP") formed to operate, acquire, and develop oil and natural gas properties in North America with long-lived, predictable production profiles. (D.I. 15 ¶¶ 3, 40) Vanguard is a publicly traded Delaware limited liability company focused on the acquisition and development of mature, long-lived oil and natural gas properties in the United States. (*Id.* at ¶ 41)

Defendants Eric Mullins, Charles W. Adcock, Jonathan C. Farber, Townes G. Pressler, Jr., John A. Bailey, and Jonathan P. Carroll were members of LRR Energy's board of directors at the time of the transaction (collectively, the "LRR Energy Individual Defendants"). (D.I. 30 at 4) Defendants Scott W. Smith, Richard A. Robert, Richard Anderson, Bruce W. McCullough, and Loren Singletary were and still are members of Vanguard's board of directors (collectively, the "Vanguard Individual Defendants," with Vanguard, the "Vanguard Defendants," and with the LRR Energy Individual Defendants, the "Individual Defendants"). (*Id.*)

### B.    Plaintiff's Claims

Vanguard filed the Registration Statement on June 3, 2015, and it was amended several times before finally becoming effective on September 3, 2015. (D.I. 15 ¶¶ 49-50) LRR Energy issued the Proxy on September 3, 2015, which was incorporated into the Registration Statement by reference. (D.I. 30-1) On October 5, 2015, LRR Energy held a special meeting where its unitholders approved the transaction. (D.I. 15 ¶ 4)

Before the transaction, LRR Energy historically made "increasing cash distributions [to its unitholders] despite the unfavorable market environment." (*Id.* at ¶ 3)

2

The Proxy and Registration Statement both stated that "Vanguard believes [LRR Energy's] assets will provide consistent and predictable cash flow volumes that will enable Vanguard to continue to make consistent monthly cash distributions to its unitholders and, over time, improve equity valuation." (D.I. 30-1 at 129) According to plaintiff, the Proxy and Registration Statement failed to disclose that Vanguard's then-current financial projections showed that it would violate existing debt covenants in certain future periods. (D.I. 15 ¶ 6; D.I. 31 at 6) The Proxy and Registration Statement also failed to disclose the consequences that existing debt servicing issues would have on Vanguard's payment of cash distributions to unitholders. (*Id.*)

## C. Vanguard's Debt Covenants

To explain why some of defendants' arguments are unpersuasive, the court provides some background regarding Vanguard's debt covenants. On September 30, 2011, Vanguard and certain financial institutions acting as lenders and administrative agent entered into a Third Amended and Restated Credit Agreement (the "Credit Agreement"). (Vanguard, Current Report (Form 8-K) (Oct. 5, 2011)) The Credit Agreement contains two debt covenants: Consolidated Leverage Ratio and Consolidated Current Ratio, but only the Consolidated Leverage Ratio appears to be at issue in this case. Vanguard's Credit Agreement was amended several times, but no changes were made to the terms of the Consolidated Leverage Ratio set forth in Section 9.01(a) until around the time Vanguard announced its transaction with LRR Energy. Section 9.01(a) originally stated that Vanguard "will not, as of the last day of any fiscal quarter, permit the Consolidated Leverage Ratio to be greater than 4.00 to 1.00." (*Id.*, Ex. 10-1 (Credit Agreement) at p. 91)

3

The Credit Agreement defines how Consolidated Leverage Ratio is calculated.

For ease of following the several definitions, each term within a definition that is further

defined has been bolded. The Credit Agreement defines Consolidated Leverage Ratio

as "the ratio of (a) **Total Debt** as of such date to (b) **EBITDA** for each four consecutive

fiscal quarter period ending on such date of determination." (*Id.* at p. 7) "Total Debt"

means:

> [A]ll **Debt** of the Parent, the Borrower and the Subsidiaries on a
> consolidated basis, excluding (i) noncash obligations under **ASC 815** and
> (ii) accounts payable and other accrued liabilities (for the deferred
> purchase price of Property or services) from time to time incurred in the
> ordinary course of business which are not greater than sixty (60) days
> past the date of invoice or delinquent or which are being contested in
> good faith by appropriate action and for which adequate reserves are
> maintained in accordance with GAAP.

(*Id.* at p. 27) The term "Debt" is a lengthy definition with thirteen subparts. (*Id.* at p. 7)

It is sufficient to note that Debt "shall include all obligations ...of the character described

[in the subparts] to the extent [Vanguard] remains legally liable in respect thereof

notwithstanding that any such obligation is not included as a liability of such Person

under GAAP." (*Id.*) "ASC 815" means the Accounting Standards Codification No. 815

(Derivatives and Hedging), as issued by the Financial Accounting Standards Board. (*Id.*

at p. 4) Finally, "EBITDA," also a lengthy definition, states in relevant part that

consolidated net income must exclude "any noncash revenue or expense associated

with Swap Agreements resulting from ASC 815," and all the components of EBITDA,

must be "determined ... in accordance with GAAP." (*Id.* at p. 27)

Exhibit D to the Credit Agreement distills all of these definitions into a one-page

form to be used to calculate the Consolidated Leverage Ratio. For the sake of clarity

that will be helpful later, the court recreates the relevant part of that form here.

4

I.   Section 9.01(a) – Consolidated Leverage Ratio

A.  Total Debt

    1.  Debt, less                               $_____

    2.  Non-cash obligations under ASC 815, less    ($_____)

    3.  Accounts payable and other accrued liabilities not greater than 60 days past due or which are being contested in good faith    ($_____)

    4.  Total Debt                         $_____

B.  EBITDA

    1.  Consolidated net income, less          $_____

    2.  Non-cash revenue or expense associated with Swap Agreements resulting from ASC 815, less    ($_____)

    3.  Income or plus loss from discontinued operations and extraordinary items, plus    ($_____)

    4.  Income taxes, plus                  $_____

    5.  Interest expense, plus               $_____

    6.  Depreciation, plus                  $_____

    7.  Depletion, plus                   $_____

    8.  Amortization, plus                 $_____

    9.  Non-cash and extraordinary items      $_____

    10. Total EBITDA                  $_____

Ratio (Line I.A.4 ÷ Line I.B.10)        _____ to 1.0

(Vanguard, Current Report (Form 8-K) (Oct. 5, 2011) Ex. 10-1 (Credit Agreement) at Ex.

D (Form of Compliance Certificate))

### D.    Vanguard's Debt Servicing Problems

On May 4, 2015, a few weeks after announcing the merger with LRR Energy, Vanguard released its first-quarter 10-Q for 2015. (Vanguard, Quarterly Report (Form 10-Q) (May 5, 2015) at p. 12) The 10-Q disclosed that, as of the end of the first quarter, Vanguard was in compliance with all debt covenants but then warned, "[b]ased on projected market conditions and lower commodity prices, we currently expect that we will not be in compliance with our total leverage ratio covenant in certain future periods." (*Id.*) It appears that the term "total leverage ratio" means Consolidated Leverage Ratio, because there is no covenant for "total leverage ratio" in the Credit Agreement, and the terms "total' and "consolidated" have similar meanings.

To counterbalance the warning, Vanguard added that it had been in discussions with its lenders regarding amending the Consolidated Leverage Ratio and, based on those discussions, expected the covenant to be raised and the borrowing base to be lowered. (*Id.*) Vanguard further warned that:

> Absent the success of amending our leverage ratio, a resultant breach of the covenants under our Reserve-Based Credit Facility would cause a default under the reserve-based credit agreement and the lenders would be able to accelerate the maturity of the credit agreement and exercise other rights and remedies. This, in turn, would cause a default under the senior notes due in 2020 and permit the holders of those notes to accelerate their maturity.

(*Id.*)

On June 3, 2015, Vanguard entered into the eighth amendment to its Credit Agreement (the "Amendment"). (Vanguard, Current Report (Form 8-K) (June 4, 2015)) As expected, the Amendment decreased Vanguard's borrowing base and raised the Consolidated Leverage Ratio. (*Id.*) Interestingly, the Amendment also provided that the borrowing base would automatically increase by $200 million, half the amount of the

decrease, upon the closing of the transaction with LRR Energy. (*Id.*) Proceeding in

parallel with Vanguard's acquisition of LRR Energy was Vanguard's acquisition of Eagle

Rock Energy Partners, L.P. ("Eagle Rock"), another MLP engaged in the oil and gas

business. (Vanguard, Current Report (Form 8-K) (May 22, 2015))  There was no similar

automatic increase upon Vanguard's closing of a transaction with Eagle Rock.

The Amendment provided for a large increase to Vanguard's Consolidated

Leverage Ratio of 4.0 to 1.0, followed by subsequent small reductions.  Specifically, the

amendment provided:

| Period during which Fiscal Quarter Ends | Maximum Consolidated Leverage Ratio |
|---|---|
| June 30, 2015 through December 31, 2015 | 5.50 to 1.00 |
| March 31, 2016 through December 31, 2016 | 5.25 to 1.00 |
| March 31, 2017 and thereafter | 4.50 to 1.00 |

(Vanguard, Current Report (Form 8-K) (June 4, 2015))

Vanguard issued only one additional 10-Q between May 4, 2015, when it warned

of future debt covenant violations, and October 5, 2015, when the LRR Energy

unitholders voted on the transaction.  (Vanguard, Quarterly Report (Form 10-Q) (Aug. 4,

2015))  That 10-Q did not address whether Vanguard's then-current expectations

regarding compliance with the Consolidated Leverage Ratio had changed in light of the

Amendment.  (*Id.* at p. 12)

## E.    Post-Closing Distributions

On October 19, 2015, a few weeks after completing the acquisition of LRR

Energy and Eagle Rock, Vanguard announced that its cash distribution attributable to

the month of September 2015 and paid in November 2015 would be $0.1175 per

7

common unit ($1.41 on an annualized basis).  (Vanguard, Quarterly Report (Form 10-Q)

(Nov. 9, 2015) at p. 27)  On December 18, 2015, a few weeks before Vanguard's

Consolidated Leverage Ratio would be reduced per the terms of the Amendment,

Vanguard announced that distributions attributable to the month of November 2015 and

payable in January 2016 would be reduced from $0.1175 per common unit to $0.03 per

common unit or, on an annualized basis, from $1.41 per unit to $0.36 per unit.  (D.I. 15

¶ 60)  According to the press release, this distribution level "represents an approximate

75% reduction" from the distribution paid the prior month.  (*Id.*)  Scott W. Smith

("Smith"), the President and CEO of Vanguard, is quoted as saying:

> Lowering the common unit distribution from $1.41 annualized to $0.36
> annualized reduces the cash required for distributions from
> approximately $185 million to $47 million.  Excess cash flow that is
> generated by this action will be directed at paying down debt under
> Vanguard's revolving credit facility and is expected to result in significant
> distribution coverage in both 2016 and 2017 based on current commodity
> strip prices.

(*Id.* at ¶ 61)  This appears to be the first time Vanguard publicly addressed concerns

about debt covenant compliance since its warning in the first-quarter 10-Q.

On March 4, 2016, a few weeks before Vanguard's Consolidated Leverage Ratio

was again reduced, Vanguard announced that its board of directors voted to suspend all

cash distributions on both common and preferred units.  (*Id.* at ¶ 62)  In the press

release, Smith acknowledged that Vanguard was taking these actions in order to reduce

the company's debt in 2016.  (*Id.*)  Plaintiff alleges that after these public

announcements, the value of Vanguard's common units collapsed.  (*Id.* at ¶ 8)

## III.   STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), plaintiff must plead

facts sufficient to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal,*

556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Fed. R. Civ. P. 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 545 (internal punctuation and quotation marks omitted). Although "[d]etailed factual allegations" are not required, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678. When considering a Rule 12(b)(6) motion, the court accepts "as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998).

## IV. DISCUSSION

The amended complaint (the "Complaint") has four counts: count 1 against the Vanguard Defendants for violation of Section 11 of the Securities Act based on the Registration Statement; count 2 against the Vanguard Defendants for control person liability under Section 15 of the Securities Act; count 3 against all defendants for violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder based on the Proxy; and count 4 against the Individual Defendants for control person liability under Section 20(a) of the Exchange Act. (D.I. 15 ¶¶ 68-90) The Proxy and Registration Statement were substantively the same, and the Proxy incorporated the Registration Statement by reference. Because plaintiff based his Sections 11 and 14(a) claims on the same alleged misrepresentations or omissions, the court will address those claims simultaneously. Because the control person claims under Sections 15 and

20(a) depend on finding liability under Sections 11 and 14(a), those claims will be addressed second.

### A.   Section 11 of the Securities Act and Section 14 of the Exchange Act

Defendants argue that plaintiff fails to state a claim under Sections 11 and 14(a) because: (1) there is no omission where the omitted fact can be determined by a simple mathematical calculation; (2) the omission was not material; and (3) the omission did not make the Proxy and Registration Statement misleading. (D.I. 30 at 6-19) After setting forth the elements of a claim under Sections 11 and 14(a), the court will address each of defendants' arguments in turn.

#### 1.   Section 11 standard

"To state a claim under section 11, plaintiffs must allege that they purchased securities pursuant to a materially false or misleading registration statement." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273–74 (3d Cir. 2004); 15 U.S.C. § 77k. Section 11 "do[es] not require plaintiffs to allege that defendants possessed any scienter." *Adams Golf*, 381 F.3d at 274 n.7.  Negligence can form the basis of liability, but if the § 11 claim sounds in fraud, then it is subject to the heightened pleading requirements of Rule 9(b). *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 70 (D. Del. 2002); *Cal. Public Employees' Reti. Sys. v. Chubb Corp.*, 394 F.3d 126, 161 (3d Cir. 2004); *Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc.*, 730 F.3d 263, 274 (3d Cir. 2013) ("[F]raud is not an essential element of a Section 11 claims").  Plaintiff alleges that his § 11 claim is not based on fraud.  (D.I. 15 ¶ 69)

### 2.    Section 14(a) standard

"Section 14(a) seeks to prevent corporate directors or officers from procuring

shareholder approval for transactions through proxy solicitations that contain false or

incomplete disclosure of material information." *Kaufman v. Allemang*, 70 F. Supp. 3d

682, 694 (D. Del. 2014).  To state a § 14(a) claim, plaintiff must show that "(1) a proxy

statement contained a material misrepresentation or omission which (2) caused the

plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in

the solicitation materials, was an essential link in the accomplishment of the

transaction." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007).

Plaintiff's § 14(a) claim is also subject to the heightened pleading standards required by

the Private Securities Litigation Reform Act ("PSLRA").   15 U.S.C. § 78u-4(b)(1).

### 3.    Omissions

Defendants correctly note that the Third Circuit Court of Appeals has rejected

claims under §§ 11 and 14(a) where the omitted fact can be determined by simple

arithmetic and all the information necessary to perform the calculation was fully

disclosed.  D.I. 30 at 8; *see, e.g.*, *In re Donald J. Trump Casino Sec. Litig.-Taj  Mahal*

*Litig.*, 7 F.3d 357, 375 (3d Cir. 1993) (explaining that prospectus did not need to

disclose the debt to equity ratio because it disclosed the sources and amounts of

funding from which investors could determine that $75 million out of $805 million (or

9%) represented capital contributions as opposed to debt); *Ash v. LFE Corp.*, 525 F.2d

215, 219 (3d Cir. 1975) (affirming dismissal of § 14(a) claim where Proxy omitted

difference between value of directors' benefits under old and new pension plans

because Proxy supplied stockholders with the numbers from which they could have performed the subtraction themselves).

Based on these cases, defendants argue that counts 1 and 3 should be dismissed, because the purported omission is based on a "simple calculation involving three numbers," all of which the Proxy disclosed. (D.I. 30 at 2, 6-7) Defendants assert that the Consolidated Leverage Ratio equals Vanguard's "total liabilities" disclosed on page 159 of the Proxy divided by "then-projected 2017 EBITDA" disclosed on page 129-130 of the Proxy, which result can be compared to the ratios disclosed in the Credit Agreement and Amendment. (D.I. 30 at 2) A comparison of defendants' formula next to Exhibit D of the Credit Agreement (setting forth the method for calculating Consolidated Leverage Ratio) demonstrates that defendants' assertion is not necessarily correct. (*See* Section II(C) *supra*) Here is a list of just a few of the ways that defendants' formula is inconsistent with the terms and definitions in the Credit Agreement:

- The Proxy calculated total liabilities using "the acquisition method of accounting … under U.S. GAAP," but Debt under the Credit Agreement must include any obligations for which the company remains legally liable, "notwithstanding that any such obligation is not included as a liability … under GAAP." (Vanguard, Current Report (Form 8-K) (Oct. 5, 2011) Ex. 10-1 at p. 7; D.I. 30-1 at 156) Thus, there may be liabilities excluded from the Proxy that the Credit Agreement would include.

- There is no indication that total liabilities in the Proxy has excluded, as required by the definition of Total Debt in the Credit Agreement, "non-cash obligations under ASC 815," and "accounts payable and other accrued liabilities not greater than 60 days past due or which are being contested in good faith." (Vanguard, Current Report (Form 8-K) (Oct. 5, 2011) Ex. 10-1 at p. 27; D.I. 30-1 at 159)

- The Proxy discloses that its EBITDA numbers were not prepared "with a view toward compliance with GAAP," but EBITDA in the Credit Agreement requires that all determinations are made "in accordance with GAAP."

12

(Vanguard, Current Report (Form 8-K) (Oct. 5, 2011) Ex. 10-1 at p. 27;
D.I. 30-1 at 128)

- There is no indication that EBITDA in the Proxy has excluded, as required by the definition of EBITDA in the Credit Agreement, "non-cash revenue or expense associated with Swap Agreements resulting from ASC 815" and "income or plus loss from discontinued operations and extraordinary items." (Vanguard, Current Report (Form 8-K) (Oct. 5, 2011) Ex. 10-1 at p. 27; D.I. 30-1 at 129-30)

In addition, neither the Proxy nor the Registration Statement provided, in any obvious manner, the numbers required to calculate the Consolidated Leverage Ratio consistent with the method provided in the Credit Agreement. For example, it is unclear that the Proxy discloses non-cash obligations or revenues under ASC 815. For these reasons, the court rejects defendants' argument that there was no omission. The Consolidated Leverage Ratio is not based on a simple calculation involving only three numbers that the Proxy disclosed. (D.I. 30 at 2, 6-7)

### 4. Material

Defendants argue that counts 1 and 3 should be dismissed, because any omission was not material. (D.I. 30 at 7-10) To adequately plead a claim under §§ 11 and 14(a), the omitted fact must be "material." 15 U.S.C. § 77k(a); 17 C.F.R. § 240.14a-9(a). An omitted fact is "material" if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus. Inc. v. Northway*, 426 U.S. 438, 449 (1976); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000).

Plaintiff alleges that cash distributions are "the key investment criterion" used to evaluate whether to invest in companies like Vanguard and LRR Energy, and any problems Vanguard had servicing its debt would directly impact whether these

13

distributions were made. (D.I. 15 ¶¶ 64-65) Plaintiff's allegations are supported by a client note issued by the law firm representing defendants which states, "an MLP's distribution is viewed as a key investment criterion by analysts and investors." (D.I. 31 at 12; D.I. 15 ¶ 65) Moreover, the Proxy and Registration Statement disclose that "Vanguard's limited liability company agreement requires Vanguard to make quarterly distributions to its unitholders of all available cash, reduced by any amounts of reserves for commitments and contingencies, including . . . debt service requirements." (D.I. 30-1 at 53) Thus, any additional cash used to service Vanguard's debt would reduce the amount of cash distributed to unitholders. Finally, plaintiff notes that LRR Energy had for years offered its unitholders consistently increasing cash distributions despite an unfavorable market environment. (D.I. 31 at 2; D.I. 15 ¶ 3) For these reasons, the court cannot conclude at this stage of the proceedings that the omissions regarding Vanguard's debt servicing problems and the concomitant impact on distributions were immaterial as a matter of law. *See In re Wilmington Trust Sec. Litig.*, 29 F. Supp. 3d 432, 446 (D. Del. 2014) (denying motion to dismiss § 11 claims because omissions relating to "a key financial metric" impacting the company's credit quality and financial condition were material).

The court is also not persuaded by defendants' arguments that the omission was speculative or pejorative and, therefore, not material. (D.I. 30 at 7) Information is usually not material if it is "speculative, unreliable, or contingent." *Mill Bridge V, Inc. v. Benton*, 2010 WL 5186078, at *10 (E.D. Pa. Dec. 21, 2010) (citing *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 290 (3d Cir. 1999)). However, "opinions, predictions and other forward-looking statements are not per se inactionable." *In re*

14

*Donald J. Trump Sec. Litig.*, 7 F.3d 357, 368 (3d Cir.1993).  Materiality of contingent or

speculative information or events depends on "a balancing of both the indicated

probability that the event will occur and the anticipated magnitude of the event in light of

the totality of the company activity." *Rockefeller*, 184 F.3d at 294 (quoting *Basic, Inc. v.

Levinson*, 485 U.S. 224 (1988)).

Here, plaintiff plausibly asserts that the probability of a debt covenant violation

was not remote and the magnitude of any violation on company activity would be

significant.  Vanguard itself disclosed in the spring of 2015 that, based on then-current

financial projections, it expected to not be in compliance with the Consolidated

Leverage Ratio in certain future periods.  (Vanguard, Quarterly Report (Form 10-Q)

(May 5, 2015) at p. 12)  Vanguard also disclosed the chain of adverse events that would

transpire if noncompliance occurred: Vanguard would cause a default under the Credit

Agreement, which would allow lenders to accelerate the maturity of that debt, which

would cause a default under senior notes due in 2020, which would allow those

noteholders to accelerate the maturity of that debt.  (*Id.*)  It is plausible that these events

would have a significant impact on the company's activity.  Accordingly, the court finds

that the Complaint plausibly alleges that the omission was material despite its

contingent nature.

Finally, defendants mischaracterize plaintiff's claims as seeking pejorative

disclosures.  Generally, companies are "not required to apply pejorative or derogatory

descriptors" to their financial disclosures.  *In re Donald J. Trump Casino Sec. Litig.*, 793

F. Supp. 543, 559 (D.N.J. 1992).  Plaintiff may have embellished in his Complaint by

alleging that Vanguard's debt "was a present reality crippling the company's balance

15

sheet" (D.I. 15 ¶ 56), but the crux of plaintiff's claim is that defendants "failed to disclose

that Vanguard was unable to satisfy the terms of its existing debt covenants based on

the 'then-current' financial information," which would impact "the company's ability to

deliver the cash distributions." (*Id.* at ¶ 6) Accordingly, the court rejects defendants'

argument that plaintiff is seeking pejorative disclosures.

### 5. Misleading

Under §§ 11 and 14(a), material omissions are actionable if "required to be

stated therein or necessary to make the statements therein not misleading." 15 U.S.C.

§ 77k(a); 17 C.F.R. § 240.14a-9(a). Defendants have assumed that the omissions were

not required and, therefore, plaintiff must show that the omissions rendered other

statements in the Proxy and Registration Statement to be misleading. (D.I. 30 at 11)

Plaintiff has not challenged that assumption.

The Proxy and Registration Statement stated:

- "Vanguard believes [LRR Energy's] assets **will provide** consistent and predictable cash flow volumes that will enable Vanguard to **continue to make consistent monthly cash distributions to its unitholders** and, over time, improve equity valuation." (D.I. 15 ¶ 58)

- "The predominantly unit-for-unit nature of the transaction is expected to **allow Vanguard to reduce leverage and strengthen its balance sheet**." (*Id.*).

- "In addition, because size is a key contributor to credit ratings for oil and natural gas … companies, increased scale could result in **improved credit ratings** for the combined entity." (*Id.*).

- "The merger provides [LRR Energy] unitholders equity ownership in an entity with a larger, more diversified asset base and a **lower cost of capital**." (*Id.*)

Plaintiff asserts that the above statements were misleading, because defendants

omitted material facts concerning Vanguard's debt servicing problems of which they

16

were already aware at the time they issued the Proxy and Registration Statement. (D.I. 31 at 14-15) The court is not persuaded by defendants' argument that plaintiff's characterization of these allegations as misleading is conclusory. (D.I. 30 at 11-12) Plaintiff alleges that Vanguard was aware, based on then-current financial projections, that it would be unable to remain in compliance with existing debt covenants. (D.I. 15 ¶ 56) These allegations are supported by the fact that Vanguard disclosed in its first-quarter that "we currently expect that we will not be in compliance with our total leverage ratio covenant in certain future periods." (D.I. 31 at 6)

The court is also not persuaded by defendants' argument that the above statements are inactionable puffery. (D.I. 30 at 14-16) "Puffery, or projections of future performance not worded as a guarantee, are generally found to be immaterial, and thus inactionable, under Federal securities law." *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 927 (D.N.J. 1998). The above statements, however, are not of general, non-specific optimism. They specifically draw a link between Vanguard's future success and the acquisition of LRR Energy. Accordingly, these are "not the type of statement[s] that [have] been found to be inactionable puffery." *Id.* at 928 (rejecting argument that statements specifically drawing a link between company's future success and acquisition were puffery).

Finally, defendants argue that the challenged statements are inactionable pursuant to the "bespeaks caution" doctrine. (D.I. 30 at 16-19) Under that doctrine, "meaningfully cautionary statements can render the alleged omissions or misrepresentations of forward-looking statements immaterial as a matter of law." *Adams Golf*, 381 F.3d at 279. "[T]he cautionary statements must be substantive and

tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Trump*, 7 F.3d at 371-72. Defendants rely on the fact that the "cautionary statements" section of the Proxy and Registration Statement disclose that the benefits of the transaction are subject to:

- "risks related to level of indebtedness and periodic redeterminations of the borrowing base under Vanguard's … credit agreements;"

- "the ability of Vanguard … to comply with covenants contained in the agreements governing their indebtedness."

(D.I. 30 at 18-19)

The "bespeaks caution" doctrine does not apply to misleading statements of present or historical facts. *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 874 (3d Cir. 2000); *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014) ("[O]missions of existing facts or circumstances are not forward-looking."). If defendants knew at the time that they issued the Proxy and Registration Statement that Vanguard did not have sufficient liquidity to stay in compliance with the Consolidated Leverage Ratio and knew Vanguard would be reducing its distributions in the near future, the "warnings are not sufficient to warrant the application of the bespeaks caution doctrine." *MobileMedia*, 28 F. Supp. 2d at 930 ("Warnings of possible adverse events are insufficient to make omissions of present knowledge of certain future events legally immaterial."); *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 130 (2d Cir. 2011) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). Indeed, if plaintiff is able to prove the allegations in the Complaint, the "cautionary statements would themselves be misleading." *MobileMedia*, 28 F. Supp. 2d at 930; *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("Courts in this Circuit have held that a

18

company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized.").

## B.    Section 15 of the Securities Act and Section 20(a) of the Exchange Act

Count 2 alleges control person liability against the Vanguard Defendants under § 15 of the Securities Act, and count 4 alleges control person liability against the Individual Defendants under § 20(a) of the Exchange Act. (D.I. 15 ¶¶ 68-90) To find control person liability under §§ 15 and 20(a), the court must first find liability under §§ 11 and 14(a), respectively. "If no controlled person is liable, there can be no controlling person liability." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 279 (3d Cir. 1992); 15 U.S.C. § 77o; 15 U.S.C. § 78t(a). Defendants presented no reason why counts 2 and 4 should be dismissed other than that primary liability under §§ 11 and 14(a) was not properly pled. (D.I. 30 at 20) Having found that plaintiff stated a claim for relief under §§ 11 and 14(a), the court denies defendants' motion to dismiss counts 2 and 4.

## C.    Eagle Rock

Finally, defendants have asked the court to take into consideration the opinion from the United States District Court for the Southern District of Texas granting defendants' motion to dismiss a class action on behalf of the Eagle Rock unitholders (the "Texas case"). (D.I. 34, Ex. A) Similar to the case here, the plaintiffs in the Texas case alleged that the proxy and registration statement at issue there failed to disclose that "cash distributions would have to be reduced to meet the debt ratio requirements of Vanguard's credit agreement." *Braun v. Eagle Rock Energy Partners, L.P.*, 2016 WL 7686899, at *2 (S.D. Tex. Oct. 21, 2016).

This court has reached a different conclusion than the Texas case for several reasons. First, it appears that Eagle Rock, unlike LRR Energy, was laboring under "a crushing amount of debt." (D.I. 35 at 2) Thus, the context in which the court must consider whether the disclosures would alter the total mix of information is not the same. Second, the Texas case concluded that there was no omission, because a breach of Vanguard's debt covenants "could be derived from basic mathematical operations" using numbers disclosed in the proxy and registration statement. *Braun*, 2016 WL 7686899, at *5. This court has rejected that argument for the reasons discussed above. *See* Section IV(A)(3) *supra*. Third, it appears that the Texas plaintiffs focused on speculation about future performance, whereas the plaintiff here focused on Vanguard's then-current knowledge that it would have to cut future distributions to stay in compliance with the Consolidated Leverage Ratio, which can be reasonably inferred from the disclosures in the first-quarter 10-Q, disclosures that the Texas plaintiffs appear not to have brought to the attention of the Texas court. Finally, in reaching its decision, the Texas court relied on cautionary statements made in the proxy and registration statement, including that future performance would depend on Vanguard's "ability to generate sufficient cash flows for making distributions." *Id.* at *7. The same cautionary statement was not included in the Proxy and Registration Statement for the LRR Energy transaction. For all of these reasons, the court does not find the decision in the Texas case persuasive.

## V. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss (D.I. 29) is denied. An appropriate order shall issue.