```
                      UNITED STATES DISTRICT COURT
                         DISTRICT OF DELAWARE

ROBERT HURWITZ            .     Case No. 1:15-CV-00711 (MAK)
                          .
          Plaintiff,      .
                          .     U.S. Courthouse
     v.                   .     601 Market Street
                          .     Philadelphia, PA 19106
LLR ENERGY L.P., et al,   .
                          .
          Defendants.     .
                          .     December 14, 2018
. . . . . . . . . . . . ..      12:33 p.m.

                      TRANSCRIPT OF TRIAL
             BEFORE HONORABLE MARK A. KEARNEY
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:

                        BLAKE A. BENNETT, ESQ.
                        COOCH AND TAYLOR
                        The Brandywine Building
                        1000 N. West Street
                        10th Floor
                        Wilmington, DE 19801

                        STEPHEN J. ODDO, ESQ.
                        ERIC M. CARRINO, ESQ.
                        ROBBINS ARROYO, LLP
                        5040 Shoreham Place
                        San Diego, CA 92122

For the Defendants:

                        TRAVIS STEVEN HUNTER, ESQ.
                        RICHARDS, LAYTON, & FINGER, PA
                        One Rodney Square
                        Suite 600
                        920 N. King Street
                        Wilmington, DE 19801

                        W. SCOTT LOCHER, ESQ.
                        HUNTON, ANDREWS & KURTH, LLP
                        600 Travis Street
                        Suite 4200
                        Houston, TX 77002
```

PILAR GABRIELLE KRAMAN, ESQ.
YOUNG, CONAWAY, STARGATT &
TAYLOR, LLP
Rodney Square
1000 N. King Street
Wilmington, DE 19801


JEFFREY CROUGH, ESQ.
MARISA SECCO, ESQ.
VINSON & ELKINS, LLP
2001 Ross Avenue
Suite 3900
Dallas, TX 75201


Audio Operator:          U. HEVENER

TRANSCRIBED BY:          NEAL R. GROSS




        Proceedings recorded by electronic sound
    recording, transcript produced by transcription service.

1

```
 1                THE CLERK:  All rise.  Court is now in session, the
 2    Honorable Mark A. Kearney presiding.
 3                THE COURT:  Good afternoon.  Please be seated.
 4                We're here this afternoon to consider a final
 5    approval of a settlement that we preliminarily approved on July
 6    26ᵗʰ and 29ᵗʰ and I believe the 30ᵗʰ of 2018 and consider the
 7    Court's concerns after scrutinizing that final approval.
 8                May I have the entry of appearance first for
 9    Plaintiff's counsel.
10                MR. ODDO:  Good afternoon, Your Honor.  Stephen Oddo
11    from Robbins Arroyo on behalf of Plaintiff in the class.  I
12    have with me Eric Carrino from Robbins Arroyo as well, and
13    Blake Bennett.
14                THE COURT:  Welcome.  Thank you for being here.
15    Thank you for the travel to make it to the hearing.
16                MR. LOCHER:  Scott Locher with Hunton, Andrews &
17    Kurth for the LLR individual Defendants.  And with me is Travis
18    Hunter.
19                MR. HUNTER:  Good afternoon, Your Honor.
20                THE COURT:  Good afternoon.
21                MS. KRAMAN:  Good afternoon, Your Honor.  Pilar
22    Kraman at Young Conaway for the Vanguard Defendants.  And with
23    me at counsel table is Jeff Crough and Marisa Secco from Vinson
24    & Elkins.
25                THE COURT:  Good.
```

1          MS. KRAMAN:  And Ms. Secco will be presenting for

2    Vanguard.

3          THE COURT:  Thank you very much.  Welcome, and thank

4    you for your travels to be here today.

5          So, Mr. Oddo, I will let you take the order, or

6    somebody from your side.  I note the hearing is scheduled for

7    12:30.  It was put in the notice for our first day.  I note

8    there's no persons in the courtroom other than counsel who have

9    identified themselves, and members of the court staff.

10         Mr. Oddo, the first question before I ask you to

11   recite, did you receive any indication of any sort from any

12   objector to the settlement?

13         MR. ODDO:  We have not, Your Honor.

14         THE COURT:  So, tell me what has happened, Mr. Oddo,

15   since we were together and we worked together I think to reach

16   what I thought to be a more equitable approach to the

17   distribution of funds.  Tell me what's going on.

18         MR. ODDO:  Sure.  Following the entry of the

19   Preliminary Approval Order the claims administrator sent out

20   15,962 claims packets to the former unit holders, the names of

21   unit holders that were received from nominees.  Everybody that

22   got the class notice received also a claims packet.

23         The notice and all of the relevant docs –

24   documentation was also put on the claims administration website

25   as well as the Robbins Arroyo website.  And the preliminary

1  approval order called for a claims deadline of I believe it was

2  November 26th.  By that time, the claims administrator had

3  received 2,198 claims.  They are in the process, they have

4  started the process of verifying those claims, and have

5  indicated to us that that process should be completed in no

6  more than 6 months from the date of the deadline for, for

7  claims.

8          We've also instructed the claims administrator to

9  accept claims that come in that have come in late.  I believe

10 there's only been one or two so far.  But we certainly will

11 give unit holders some leeway on that issue.

12          The claims administrator has also been instructed to

13 post an update every 45 days on the – on their website as to

14 the progress related to the verifying of claims and the

15 subsequent payments that will be made to the claims that are

16 valid.

17          So, that's – well, I'll also add that no objections

18 have been received, and that that deadline has passed as well.

19          THE COURT:  Okay.

20          MR. ODDO:  So that's kind of looking back.

21          Looking forward, what we expect to happen if the

22 settlement is approved is 30 days after the final approval

23 order is entered, the initial $5.00 payments that were

24 determined to be appropriate –

25          THE COURT:  For everyone giving a release; is that

1   right?

2           MR. ODDO:  Correct.

3           THE COURT:  So everyone who is giving a release,

4   everyone gets $5.00?

5           MR. ODDO:  Yes.

6           So those payments are supposed to go out as soon as

7   the Final Approval Order becomes final and not, not appealable.

8   And the feedback we got from the claims administrator was that

9   that was not going to be a problem.  So as soon as that date

10  passes they should be able to get those checks out right away.

11          THE COURT:  Okay.

12          MR. ODDO:  Then, as I mentioned, approximately 6

13  months after the filing deadline, after all the verification

14  process has been completed, checks to the unit holders who

15  submitted valid claims will be sent out.

16          THE COURT:  Refresh me.  Is that – how, how are we

17  calculating that money?

18          MR. ODDO:  Sure.

19          THE COURT:  There's 2,190 claims, 2,198 claims you

20  described to me.

21          MR. ODDO:  Yeah.  And that represents approximately

22  3,080,000 units.

23          THE COURT:  Okay.

24          MR. ODDO:  So, the way that's going to be calculated

25  is there's an $8 million common fund.  Once you take out

1    whatever fees are awarded and the claims administration fees or

2    costs, then what is left, also after the $5.00 payments, which

3    is approximately $80,000, --

4            THE COURT:  Okay.

5            MR. ODDO:  -- once all that is deducted, then what's

6    left will be distributed to those who have submitted valid

7    claims on a prorated basis based on the number of units that

8    they held at the time of the closing of the transaction.

9            THE COURT:  Okay.  Have you decided what the unit

10   price will be?

11           MR. ODDO:  Well, yes.  I mean, we've done the

12   calculations.  And assuming all of the claims that have been

13   submitted are valid –

14           THE COURT:  Okay.

15           MR. ODDO:  -- then the per unit price would be

16   approximately $1.57.

17           THE COURT:  Okay.

18           MR. ODDO:  Which is pretty extraordinary results.

19   That's 20 percent –

20           THE COURT:  Right.

21           MR. ODDO:  -- increase based on the compensation that

22   the LRE shareholders received via the transaction back in 2015.

23   You know, that, that's a pretty good result.

24           THE COURT:  Okay.  And when – you may have told me at

25   the preliminary but when I was looking through it I couldn't

1  find it, at what stage do the class counsel get paid?  And tell

2  me about the status of payment to the claims administrator.

3     MR. ODDO:  Sure.  The claims administrator has not

4  been paid anything yet.

5     THE COURT:  Okay.  When does the claims administrator

6  – what, Garden City; right?

7     MR. ODDO:  It's Garden City.  They were acquired by

8  Epiq, so.

9     THE COURT:  That's right.  So Epiq, too.  When do

10  they, when do they get paid under this plan?

11     MR. ODDO:  They should get paid at the same time as

12  the five – well, they're going to have incremental bills,

13  right?

14     THE COURT:  Right.  Sure.

15     MR. ODDO:  Because they're going to be verifying the

16  claims through probably mid-2019.  But they certainly have

17  bills that are outstanding now.  So, it would be our intention

18  that they get paid once the order becomes non-appealable and –

19     THE COURT:  Paid what?  Paid, paid on outstanding

20  invoices?

21     MR. ODDO:  Yes.

22     THE COURT:  Okay.  So, they're paid in full after –

23  do you have any idea where that is?

24     MR. ODDO:  Yes.  There was approximately $45,000 for

25  the class notice that was sent out about a year ago after the

1  class was certified.

2          I believe that they have incurred about another

3  $55,000 in sending out the claims packets and notice of the

4  settlement.

5          They have estimated that the additional costs for

6  verifying the claims, sending out the $5.00 checks, and then

7  ultimately sending out the second checks is going to be

8  somewhere in the neighborhood of $70,000 to $90,000.  So –

9          THE COURT:  Why is that?  I mean, you just told me

10  it's only 45,000 for the first mailing.  And that, and that

11  would be everybody; right?  That would be, that would be the

12  $5.00 check people; right?  Wouldn't that be the same number as

13  the mailing – we had to approach these fluctuations last

14  January, but it's around the same numbers.

15          MR. ODDO:  Well, we inquired with Epiq as to what the

16  costs associated with the $5.00 checks being sent out would be.

17  They, they told us it was going to be an approx. –

18  approximately an additional $20,000 to $25,000.  So that's

19  included in the $70,000 to $90,000 that they expect to incur

20  for the sending out of the $5.00 checks, the verification of

21  all the claims, ultimately sending out the second checks.  And

22  depending on what is left, you know, after checks don't get

23  cashed and so forth, potentially a final distribution as well.

24          THE COURT:  What are you allocating at the end of the

25  day when you're looking at this maybe in June or July, what are

1   you thinking they're going to be in for?  How much?  How much

2   to be paid in total?

3           I know it's an estimate, but you know what they've

4   already incurred.

5           MR. ODDO:  Sure.  I think it's, based on what they've

6   told me, it's going to be, somewhere between $160,000 and

7   $180,000, including the original class notice.

8           THE COURT:  Okay.  Including, right, including the

9   original class notice.  Okay.

10          MR. ODDO:  Yeah.

11          THE COURT:  All right.  So that's the claims

12  administrator.

13          How do, how if I award 2.4, how does class counsel

14  get paid?

15          MR. ODDO:  Well, based on your representation at the

16  preliminary approval hearing that class counsel should not get

17  paid before the class gets paid something, what we worked in, I

18  believe, to the second addendum to the –

19          THE COURT:  Okay, right.  All right.

20          MR. ODDO:  -- to the stipulation of settlement was

21  that once those checks go out, class counsel and if the service

22  award is approved for the lead Plaintiff, then those would be

23  sent out as well.

24          THE COURT:  Right.  And it's my understanding that

25  that's in full; right?  So, class counsel would be paid its

1    awarded amount and the Plaintiffs represented on the case the

2    awarded amount.  Could be by the end of January then, assuming

3    I have an order in December.

4              MR. ODDO:  Yes.

5              THE COURT:  Okay.

6              MR. ODDO:  And I would, I would – I mean, I was going

7    to get into this when we were talking about the attorneys' fees

8    and expenses, but –

9              THE COURT:  Well, yes.  I wanted to get a time of

10   allocation for them.

11             So, is the, is the amount of the claim – who is

12   reviewing post-February 1 claims administrator's bills?  Is it

13   still you and the defense counsel as well.

14             MR. ODDO:  We get their invoices and we review them.

15    We obviously haven't authorized any to be paid yet.

16             THE COURT:  That's my question.

17             MR. ODDO:  But that's our oversight responsibility.

18             THE COURT:  And you will do that going through,

19   through May or June, I suspect, or July maybe, depending on how

20   long it takes?

21             MR. ODDO:  Yes.

22             THE COURT:  Okay.  On the plan of allocation you talk

23   about what happens to money, uncashed checks, cy pres actually.

24   Any thought?  I'm mindful of the way our Court of Appeals, I

25   can say that because Delaware's the same Court of Appeals,

1    looks at now the cy pres, is there any thought of what, any

2    idea what that number is going to be, where it might be?  Any

3    appreciation from your, from your experience maybe?

4              MR. ODDO:  Well –

5              THE COURT:  Because the cy pres right now is zero, as

6    I understand it; right?

7              MR. ODDO:  Yes.

8              THE COURT:  There's nothing, right, there's nothing –

9    some settlements have, already have some money, but there's

10   nothing here.

11             MR. ODDO:  No, there's nothing here.  I mean, it's

12   our expectation that it's not going to be a lot.

13             THE COURT:  Okay.  Okay.  And it would be, what it

14   would be then would be that people don't cash checks; right?

15             MR. ODDO:  Correct.  But I think the way it's

16   structured –

17             THE COURT:  How about the balance, I'm sorry, how

18   about the balance, how much did you allocate the claims

19   administrator, and would there be a balance there?  I mean, if

20   you don't spend all the claims administrator's budget.

21             MR. ODDO:  Sure.

22             THE COURT:  It sounds like, I think you if told me a

23   number, I think you're below it, are you not?

24             MR. ODDO:  I think we estimated originally that it

25   was going to be 150,000 total.

1          THE COURT:  Oh, I thought it was about 200.

2          MR. ODDO:  But I think so it may be a little bit

3   higher than that.

4          THE COURT:  Okay.

5          MR. ODDO:  But that takes into – this is a little bit

6   unusual because we did have class certification not as part of

7   the settlement process, so there had to be an additional

8   mailing.

9          THE COURT:  Right.  You had two; right?  You had two;

10  right?

11         MR. ODDO:  Yes.

12         THE COURT:  Okay.  So, go ahead.  So, what is the,

13  what is the – you'll do monitor, you'll monitor that.  What is

14  your expectation then would be checks, anything else?  In cy

15  pres.  You were hesitating and I interrupted you.  I apologize.

16         MR. ODDO:  Well, I think the way it's structured is

17  that if there is enough left after uncashed checks, that there

18  would be another distribution.  But if there is not, then that

19  goes into cy pres, and -

20         THE COURT:  All right.  Is that a, is there a term

21  here that brings it back to me to do that or is that a

22  threshold determination by counsel?  Who makes that

23  determination as to whether it's cy pres or redistribution?

24         MR. ODDO: I believe we'll make that, that

25  determination.

```
1              THE COURT:  Okay.  Is there a threshold on that?  For
2       some reason I thought I saw a number or remembered a number.
3       Is it ten?
4              MR. ODDO:  Yes.
5              THE COURT:  I remember ten.  I just wanted to make
6       sure.
7              MR. ODDO:  I believe it is $10.00.
8              THE COURT:  No, no.  Not ten.  No, no, not $10.00.
9       No, no, I'm talking about the, I'm talking about the amount of
10      money that would, when you would decide to do a redistribution
11      it has to be more than $10.00.  Wasn't it $10,000?  Wasn't it
12      an amount, say, okay, say we have $25,000 that's not cashed, is
13      that cy pres or is that redistribution?
14             MR. ODDO:  I think it was, it was dependent on what
15      the per unit amount to – or per check amount to the unit
16      holders who submit valid claims would be.  And I think that was
17      the $10.00 threshold.  Let me check.
18             THE COURT:  Oh, I see.  I see.  Okay.  Okay.
19             So, how are you going to measure that?  Do you have
20      to know –
21             MR. ODDO:  We'll get an accounting from the, from the
22      claims administrator telling us what's left.
23             THE COURT:  And then how do you – but my bottom line
24      is then how are you – Many times, not typically, I should say
25      many times you come back to the court and say, Judge,
```

1    especially in the 3rd Circuit for cy pres rulings, Judge, I

2    want a cy pres or I want to redistribute.

3            Give me some guidance for the class as to what your

4    measure is here.  How are you going to decide if it's $50,000

5    left in the account is that – I mean, how are you going to

6    decide whether to redistribute or set a cy pres?

7            MR. ODDO:  Well, I think because we did put something

8    into the notice.

9            THE COURT:  I didn't feel – You did?  Let's take a

10   look at it.  That's what I was looking for.

11           MR. ODDO:  It says we'll make a second distribution

12   to claimants who cash their checks from the initial –

13           THE COURT:  Yeah, right.

14           MR. ODDO:  -- distribution and who would receive at

15   least $10.00 after payment of the estimated costs.

16           THE COURT:  Right.  Yeah, that's the – that's right.

17           Then you say – oh, oh, this is the -- Your first

18   payment is your amount, then you'll make a distribution of

19   those who at least receive ten.  Okay.

20           MR. ODDO:  And then what's left of that becomes the

21   cy pres.

22           THE COURT:  Well, my question was, this is I have it

23   circled here, is de minimis.  You're making that determination;

24   right?

25           MR. ODDO:  Yes.

1          THE COURT:  And that de minimis will be based on the

2     cost I imagine, cost-benefit analysis will be done.

3          MR. ODDO:  Correct.  I mean, obviously if there's

4     $20,000 left and it costs $25,000 to send out the checks, that

5     doesn't make sense.

6          THE COURT:  That's my, that's – But I wanted to put

7     on the record that we all have an understanding of that, that

8     there – yeah, we all have an understanding of that.

9          Okay.  All right, let's turn then – well, let me

10    first turn to the respectful Defendants, respective and

11    respected Defendants to ask if they have any concerns, thoughts

12    on the plan of allocation, its fairness to their client in the

13    settlement.  Have you heard anything, first, from the

14    claimants?

15         MR. LOCHER:  We have not, Your Honor.  I think the

16    only issue which I'm sure will be addressed is the one or two

17    unit holders who have previously requested to opt out of the

18    class, have now given notice that they would like to be part of

19    the class for purposes of settlement.

20         THE COURT:  Okay.

21         MR. LOCHER:  So that's, that's I think the only issue

22    on the defense side.  We have consented to that, so that's just

23    something that just needs to be built into the final order.

24         THE COURT:  Okay.  We'll deal with that.

25         From the – and you have LLR?

1           MR. LOCHER:  Correct.

2           THE COURT:  Who has Vanguard?  Sir?

3           MR. CROUGH:  Yes, Vanguard.  We've heard nothing

4    either, Your Honor.

5           THE COURT:  And other than the issue with the people

6    who are listed at 195-2, the 22 persons.  How many people?  How

7    many people are on that list?  I have it, I have it here.

8           MR. CROUGH:  Correct, Your Honor, it's 22.

9           THE COURT:  Twenty-two.  Other than that issue, do

10   you have any other concerns with the fairness of the settlement

11   or how we address that?

12          MR. CROUGH:  No, Your Honor.

13          THE COURT:  Okay.  All right.  So let's turn then to

14   the 22.  I was going to ask if after all that, objections and

15   everything, I was going to ask is there any issues with any of

16   the opt outs.  Apparently, there is, so tell me about that.

17          MR. ODDO:  So, we had two of the unit holders,

18   presumably husband and wife, they have the same last name, who

19   requested exclusion and then submitted a claim form to the

20   claims administrator because they still got the notice.

21          THE COURT:  Okay.  So, they're one, I mean just to

22   get them on the record, that would be in document you have 195-

23   2.  So, let me get it.

24          MR. ODDO:  It is the Winships.

25          THE COURT:  What's their name?

```
 1              MR. ODDO:  Robert M. Winship.

 2              THE COURT:  Okay.

 3              MR. ODDO:  It's W-I-N-S-H-I-P, and Joanne M. Winship.

 4              THE COURT:  Okay.  So they both opt, they both filed

 5   an opt out and then they sent a claim in?

 6              MR. ODDO:  Correct.

 7              THE COURT:  All right.  So, what, how, what has

 8   happened since then?

 9              MR. ODDO:  We have discussed it with defense counsel

10   and we would recommend that they be allowed to receive their

11   pro rata share of the settlement, including the $5.00 payment.

12              THE COURT:  Would I be correct, to state the obvious,

13   that they opted out first?

14              MR. ODDO:  Correct.

15              THE COURT:  And then in their claim form did they

16   make any reference to their opt out?

17              MR. ODDO:  No, I don't believe so.

18              THE COURT:  Same, did you get a chance to talk to

19   either of them?

20              MR. ODDO:  I believe not.

21              THE COURT:  Do you have a copy of the two forms?

22              MR. ODDO:  Yes.

23              THE COURT:  -- by any chance?

24              May I look at them?  You may approach and hand them.

25   I want to, I'd like to see their opt out and their claims form
```

1  in there.

2            Thank you, sir.

3            (Pause.)

4            THE COURT:  So, it looks like a joint account.

5            MR. ODDO:  Yes.

6            THE COURT:  Okay.  Both joint accounts?

7            MR. ODDO:  Yes.

8            THE COURT:  All right.  So, if I read this right, Mr.

9  Oddo, is that, is what it appears to be that on May 1 they

10 asked for exclusion.  And then I was looking for a date on the

11 claimant.  Oh, August 19th – August 18th.  No, August 29th.

12           MR. ODDO:  Yes.

13           THE COURT:  August 29th, okay, they asked – they

14 filed that then.

15           Okay.  It appears to me, and I am not in any sense an

16 expert in handwriting, but it does appear to me to be, this

17 handwriting seems similar, I think it would be the same persons

18 to have sent, have done this.  Representation is they have not

19 contacted you nor – I should ask the question have they

20 contacted Garden City to your knowledge?

21           MR. ODDO:  Not to my knowledge.

22           THE COURT:  Other than this?

23           MR. ODDO:  Yes.

24           THE COURT:  Okay.  Your recommendation is that we add

25 then in, sort of amend our identity, amend 195-2 to remove them

1   from the opt out list.

2           MR. ODDO:  Correct.

3           THE COURT:  And consider them as part of the, both

4   part of the $5.00 and part of the claim.

5           MR. ODDO:  Yes.  And defense counsel has also

6   suggested that there be a footnote included in the Final

7   Approval Order that confirms that they are subject to the

8   release language.

9           THE COURT:  Okay.  You mean them, those persons

10  specifically I guess, is the concern?

11          MR. ODDO:  Yes.

12          THE COURT:  Counsel for the defense, has there been –

13  two questions, has there been any claim filed by any of the opt

14  outs?  And would it possibly be timely, is there any

15  possibility of a timely claim under state, even under state

16  law?

17          MR. LOCHER:  No, not claim that we –

18          THE COURT:  I mean, it would be 2015.

19          MR. LOCHER:  No claim that we know of.  And with

20  respect to state law, Texas state law, --

21          THE COURT:  Right.

22          MR. LOCHER:  I know the statute of limitations for

23  fraud in general is 4 years.

24          THE COURT:  Oh, it is?  Okay.

25          MR. LOCHER:  With respect to the securities claims, I

1  think the statute of limitations has run, so.

2          THE COURT:  Right.  But the fraud claim is still out,

3  could under Texas law still be there?

4          MR. LOCHER:  But, you know, any state might, might

5  have a different statute of limitations.  But just speaking to

6  Texas where, where I'm licensed, it's 4 years.

7          THE COURT:  And, arguably, representation came out of

8  Texas; right?  Arguably.  Didn't it, I mean weren't the issuers

9  – I mean for LLR weren't they in Texas?

10         MR. LOCHER:  I'm not willing to, to stipulate to that

11 at this point but.

12         THE COURT:  Okay.  All right.  Yeah, that's fair, I

13 won't lead you, okay.

14         MR. LOCHER:  The limited partnership I believe was

15 formed under Delaware's, Delaware law.

16         THE COURT:  Right.  But am I correct if I –

17         MR. LOCHER:  Headquartered.

18         THE COURT:  -- they're in Houston; right?

19         MR. LOCHER:  It's headquartered in Houston.

20         THE COURT:  Okay.  Vanguard, same, is there any

21 thought that there is a statute?  Vanguard was also Houston

22 based?

23         MR. CROUGH:  That's correct, Your Honor.

24         THE COURT:  Delaware entity?

25         MR. CROUGH:  Yes.

1          THE COURT:  And is there any claim that you're aware

2    of from any of the 20, now 20 or 22 opt outs?

3          MR. CROUGH:  No, Your Honor.

4          THE COURT:  Okay.  But, again, would you agree with

5    your colleague that there could possibly be a state, a 4-year

6    claim?  Some states, I'm not aware of a 6-year fraud statute,

7    but certainly aware of 4-year statutes.  Other than that claim,

8    are you aware of any other potential state law claim out there?

9          MR. CROUGH:  No, not out there, no.

10         THE COURT:  All right.  Did you have any other

11   concerns, Defendant, on this opt out other than represented by

12   Mr. Oddo?  I'll turn to Vanguard first then.

13         MR. CROUGH:  No, we do not.

14         MR. LOCHER:  No.

15         THE COURT:  As long as we have the footnote to

16   describe them specifically?

17         MR. LOCHER:  Yes.

18         MR. CROUGH:  Yes.

19         THE COURT:  Okay.

20         (Pause.)

21         THE COURT:  Okay, thank you, counsel.  You are free

22   to continue.  That addresses the opt out.  Is there anybody

23   else that you're aware of with that kind of an issue?

24         MR. ODDO:  Not that we're aware of, no.

25         THE COURT:  Okay.  So, we've addressed the

1    objections.  There were none.

2            The opt outs, we understand who they are.  We

3    understand the risks of those persons, and defense understands

4    the risk of possibly 20 of those persons.

5            We also understand that there were two opt outs that

6    I find have subsequently claims, have signed claims and

7    released, been part of the release.

8            The plan of allocation, as I understand it now, is

9    consistent with what was described in class.

10           Before I turn to the attorneys, is there any other

11   issue you wish me to be aware of in making the Final Order?

12           MR. ODDO:  Your Honor, I think a lot of this we

13   covered in the preliminary approval hearing.  But, you know, we

14   believe that the settlement in general is fair, reasonable, and

15   adequate, and that the risk factors and the relevant prudential

16   factors have all been met.

17           So, with respect to the settlement, we think it's an

18   excellent result and –

19           THE COURT:  What's the status – part of the reason

20   the settlement made a lot of sense when you guys, when you

21   reached it with the help of Mr. Meyer was that there was a

22   concern about the financial viability of one or more of the

23   corporate Defendants.  I remember this.  There is or was a

24   bankruptcy.

25           What is the status of the bankruptcies?  Are they,

1    are they – it only raises an issue about, because I reference

2    it, what is the status?

3              MR. ODDO:  They emerged from bankruptcy.

4              THE COURT:  Okay.

5              MR. ODDO:  And they are publicly traded again,

6    Vanguard.

7              THE COURT:  Okay.

8              MR. ODDO:  I think they're not doing great.

9              THE COURT:  Okay.

10             MR. ODDO:  Because of oil prices and other factors,

11   but.

12             THE COURT:  Okay.  So, okay, so they're out of

13   bankruptcy.

14             Okay.  Is the, is there any recovery – was there any

15   recovery?  Was that an 11 in the bankruptcy, was that Chapter

16   11?  Sir, was that Chapter 11?

17             MR. CROUGH:  Yes, it was.

18             THE COURT:  I'll ask you, was there any recovery, if

19   you don't mind, was there any recovery allocated from a plan of

20   the estate in the bankruptcy of Vanguard that would have went

21   to any of these people that are getting more benefits than I

22   know of in this case?

23             MR. CROUGH:  No, there was not, Your Honor.  Although

24   I note that although Vanguard as an entity was dismissed with

25   prejudice from this action, it has still contributed 650,000

1    out of the 8 million, the total settlement in this matter.

2              THE COURT:  Well done, because that's exactly my next

3    question was, about the bankruptcy was how do they do that?  Is

4    that post-discharge?

5              MR. CROUGH:  Yes, post-discharge.

6              THE COURT:  Okay.  Your answer, though, to my other

7    question is no, there was no provision in the plan to pay any

8    of these people separate and apart from - in connection with

9    this transaction, separate and apart from the consideration in

10   this case to your knowledge?

11             MR. CROUGH:  Pardon me.  The unit holders of Vanguard

12   that, you know, emerged from the bankruptcy received warrants.

13   But that was not specifically in connection with this matter,

14   no.

15             THE COURT:  Nobody received consideration arising

16   from the allegations relating to the transaction in 2015?

17             MR. CROUGH:  That's correct.

18             THE COURT:  Okay.  Okay, so, just to, button, the

19   suspenders and belts, everything else here, just to be clear,

20   there's no, the only consideration anybody in this class is

21   receiving for the transaction in 2015 is through this

22   settlement?

23             MR. CROUGH:  Yes, Your Honor.

24             THE COURT:  Okay.  All Right, thank you.  Okay, Mr.

25   Oddo, now, I did find that the settlement met the standards of

1   Gershwin (phonetic).

2          And having read the extensive papers that were filed

3   in connection with this final approving hearing, and the filing

4   that was done by counsel to getting it ready, I have no reason

5   to dispute what happened before nor any change.  I don't see

6   any material change, I don't see any reason to find now that

7   the transaction has somehow become less fair final approval.

8          There are no objections, there are 20 exclusions.

9   So, I do find that in connection with that portion of today's

10  hearing an order should be entered.  I'll address appropriately

11  the footnote and other issues, but I find that the settlement

12  is appropriate Gershwin.

13         Turn now, just, I think I asked you this before, but

14  I'll ask it to you again, because the plan of allocation talks

15  up to $2.4 million.  For attorney's fees.

16         MR. ODDO:  That's it.

17         THE COURT:  I talked about the claim's administrator

18  a minute ago, so let's deal with really the attorney's fees.

19  Why don't you address that for me?  How you came to that 30

20  percent number.

21         And I have a legal question for you.  You came this

22  far, I have to ask you something.

23         MR. ODDO:  Okay.

24         THE COURT:  And the legal question I have for all of

25  you is interesting, and its interesting law in this circuit,

1   for those of you in Delaware.  It's interesting law in this

2   circuit.

3            Is the measure of the lodestar, the check, is the

4   measure of the hourly rate in the district of the case or the

5   district in which your home office is?

6            So, if I understand correctly, are you in San

7   Francisco, San Diego?

8            MR. ODDO:  San Diego, yes.

9            THE COURT:  Yes.  So, if your officer was in Omaha,

10  and I meant no disrespect for our friends in Omaha, but if it

11  was, and that's less hourly rate than San Diego, a bigger

12  market, the question I always hitch to these, and lawyers tell

13  me all different things on this, how do you view the lodestar

14  check, is it the hourly rate that's standard and typical and

15  comparable in Delaware or the one in the town in which you

16  practice or the town in which, I do Mr. Bennett's different

17  than yours or what do I do?

18           MR. ODDO:  Well, I think you have the discretion to

19  look at various factors and --

20           THE COURT:  Well, let's stop.  I asked everybody, I

21  said, purely, in some sense, academic because I, in this case,

22  I find the numbers anyway, but what is done in your experience?

23           And I'll ask the Defense too.  Because I'm always

24  worried about the lodestar comparison.  When I have counsels

25  outside the district.

```
1            MR. ODDO:  Sure.  I mean, I haven't had it
2    scrutinized by too many judges.  This particular question.
3            THE COURT:  Okay.
4            MR. ODDO:  We've certainly had lodestar scrutinized
5    but the point of comparison hasn't really come up.  I remember
6    a case I had in Tennessee state court a few years back.
7            The defendants, and this was a contested fee
8    application, and the defendants contended that the rate that we
9    were asking for was unreasonable and the judge, on the record,
10   insisted that defense counsel say what his rate was and he
11   balked at that and kind of became a nonissue.
12           THE COURT:  That toned it down.
13           MR. ODDO:  Yes.  But I think a variety of factors.  I
14   think you look at the practices across the industry,
15   particularly in the securities class action field.  Which I
16   think our rates are competitive.
17           You know, certainly, the difference between
18   California and Omaha is going to be probably pretty
19   significant, although I'm sure there's attorneys in Omaha who
20   have pretty high hourly rates.
21           But I think at the end of the day it comes down to
22   what factors you think are relevant in looking at the totality
23   of the circumstances.
24           THE COURT:  Do you think that judges need to have a
25   comparator affidavit if it's a fund case?
```

1             MR. ODDO:  A what?

2             THE COURT:  A fund case, your case.  The percentage

3    of the fund case.  The judge would need to have a comparator

4    affidavit on the lodestar, do you believe?

5             You don't have one, and that's okay, but that's not

6    really expert security cases, but I see in other circuits say

7    that maybe we should have it.

8             MR. ODDO:  I don't think so.  I mean, if you look at

9    our lodestar here, this case was litigated almost up to trial.

10    We had a very condensed discovery period where we took a lot

11   of depositions, so, I haven't discussed with this Defendants,

12   but I can't imagine that they'd have any question about the

13   validity of our lodestar.

14            THE COURT:  Well, I'm not asking this, I'm asking

15   only because the question arises, at what stage do judge use a

16   comparator affidavit.  I'm not seeing the securities context

17   again.  And I've seen it a lot in the consumer cases.  Because

18   you say, wait, this guy has, how do I know this is worth $850

19   an hour.

20            MR. ODDO:  I have never --

21            THE COURT:  The coupon cases.  You know, those cases,

22   you see them all the time.

23            MR. ODDO:  I've never been asked for one, and I've

24   done --

25            THE COURT:  Okay.

```
1              MR. ODDO:  -- quite a few common fund settlements,
2    both in federal court and state court, and never once been
3    asked for anything like that.
4              THE COURT:  Okay.
5              MR. ODDO:  The closest I've come is the Tennessee
6    example where they, judge wanted to know what the folks on the
7    other side were charging as well.
8              THE COURT:  Right.  Which would indicate, right,
9    okay.  All Right.  So, if I understand you correctly, your
10   lodestar between you and the Cooch Firm, as your liaison,
11   exceeded the 30 percent, is that correct?
12             MR. ODDO:  That's correct.
13             THE COURT:  By not much, but by several of tens of
14   thousand dollars, right?
15             MR. ODDO:  Correct.
16             THE COURT:  $80,000 for one.
17             MR. ODDO:  Something like that.  And it does not
18   include any of the work that we've done subsequent to
19   preliminary approval.  So all the work preparing the final
20   approval, documents, the reply brief, communications with the
21   claims administrators and unit holders, none of that is
22   included.
23             THE COURT:  Okay.  Is the number, applying the
24   various factors I must, is there, does your number, because I
25   don't have your bill so I have to ask this, are you estimating
```

 1   at all for that reason, future work you may need to do?

 2          You said all these times through preliminary

 3   approval.  Assuming there is some work to be done in this

 4   claims process, is that entirely held by Garden City or are the

 5   lawyers involved in that process?

 6          MR. ODDO:  Well, we don't get involved in the actual

 7   verification of the claims --

 8          THE COURT:  Right.

 9          MR. ODDO:  -- unless they bring something to us and

10   want some guidance from us.

11          THE COURT:  Right.

12          MR. ODDO:  So, I anticipate we will have interaction

13   with --

14          THE COURT:  Okay.

15          MR. ODDO:  -- Epic over the next six months.  But I

16   don't anticipate it to be --

17          THE COURT:  Okay.

18          MR. ODDO:  -- a lot of time.

19          THE COURT:  My question was, just clarify, the number

20   you're putting in is a little over, total number, a little over

21   $2.47, something like that, that does not include an estimate

22   for time to be incurred.

23          MR. ODDO:  Not at all.

24          THE COURT:  Times all in, before preliminary

25   approval.

1          MR. ODDO:  Correct.

2          THE COURT:  Okay.  At what stage, I also have no

3     estimate from you or no bills from you, or any, I didn't see

4     them, to show me your expenses.  Now, there's no objection, but

5     I still have an obligation to carefully scrutinize the

6     expenses.

7          Just tell me how, I'm not so worried about what you

8     spent or how you recorded that.

9          MR. ODDO:  Sure.

10         THE COURT:  Okay.  So I'm not go looking at whether

11    you spent too much at breakfast, but I'm wondering how you

12    recorded it.

13         MR. ODDO:  Sure.  And I guess this is probably the

14    appropriate time to bring up something that we raised in the

15    brief --

16         THE COURT:  Yes.

17         MR. ODDO:  -- which is, the expenses that, expense

18    cap that we put into the preliminary approval papers and the

19    notice, was $325,000.

20         THE COURT:  Right.

21         MR. ODDO:  We should have anticipated that we have

22    not yet received a bill from one of the experts and included

23    that in the preliminary approval papers and the notice, but we

24    did not.  We got that subsequent to the entry of the order.

25    So, it brings our total to approximately $457,000, which is

 1   more than what was put in the notice.

 2           The way that the expenses are recorded, and a

 3   majority of the $457,000 that we've expended is expert fees.

 4   At various points in the litigation.

 5           Certainly, with respect to the expert reports that we

 6   shared with Defendants, that was a large cost.  But we also

 7   have --

 8           THE COURT:  That was my question.  The three that you

 9   retained were all, they actually produced reports or just

10   meetings?

11           MR. ODDO:  They all produced --

12           THE COURT:  They actually produced reports?

13           MR. ODDO:  Yes.

14           THE COURT:  Okay.

15           MR. ODDO:  And then we also had experts working with

16   us at the drafting of the complaint stage, at the other various

17   stages in the litigation where we felt like we needed some

18   expert consultation.  But one of the experts that we used early

19   on was also one that submitted one of the expert reports.

20   Which was RGL.

21           THE COURT:  Okay.  So, the delta is -- is the

22   entirety of the delta, or how much of the delta is attributed

23   to the idea that you have a, you forgot about an expert --

24           MR. ODDO:  Yes.  I think it's $122,000 was directly

25   attributable to the failure to include the invoice from the

1  expert.

2          And the other --

3          THE COURT:  So, give me how that effects the, so,

4  instead of, what was the number, the cap, I have it as $350?

5  Or $325.

6          MR. ODDO:  Yes.

7          THE COURT:  What's the cap I had in the notice?

8          MR. ODDO:  $325.

9          THE COURT:  All Right.  And now it's at $4, I'm

10 sorry, I have the number here.  You're now asking for $400 --

11         MR. ODDO:  $57.

12         THE COURT:  $457, okay.  That delta affects the class

13 members how?  Everybody is still getting five, right, so it's

14 only affecting those persons who did the 1 million, the 2,198

15 claimants, right?

16         MR. ODDO:  Correct.

17         THE COURT:  It's all effective, is that right,

18 because it affects the delta number?

19         MR. ODDO:  I'm sorry?

20         THE COURT:  Okay.  The 122 delta that you're saying,

21 Judge, authorize this, you're taking that money essentially

22 from the residual after expenses, right?

23         So, what really, it doesn't affect the $5, am I

24 correct about that?

25         MR. ODDO:  Correct.

1          THE COURT:  Nobody is not getting, everybody is

2   getting $5?

3          MR. ODDO:  Correct.

4          THE COURT:  Okay.  What it affects then, am I

5   correct, that it only affects then the 2,198 claimants or maybe

6   21, is it now 2,200 by the way because I'm including in the

7   two, the husband and wife?

8          MR. ODDO:  I believe they're already included.

9          THE COURT:  Okay.  All Right.  So 2,198 claimants,

10  does it only affect them?

11         MR. ODDO:  Correct.

12         THE COURT:  Okay.

13         MR. ODDO:  And I think the actual tangible amount of

14  that is three or four cents.

15         THE COURT:  That's what I'm asking, thank you.

16         MR. ODDO:  Three or four cents per unit.

17         THE COURT:  Per unit, yes.

18         MR. ODDO:  Yes.

19         THE COURT:  What is the, help me out on, so I can

20  describe it, what is the nature, without disclosing your

21  privileged information, to the extent that there would have

22  been any, but what was the nature of the services provided by

23  the expert whose bill was not included in your calculation,

24  what did they do?

25         MR. ODDO:  They submitted a report.

```
 1                    THE COURT:  On what --

 2                    MR. ODDO:  A damages report.

 3                    THE COURT:  On what issue?

 4                    MR. ODDO:  It was the 14A damages calculation --

 5                    THE COURT:  Okay.

 6                    MR. ODDO:  -- I believe.  It was Mr. Kennedy.

 7                    THE COURT:  And that report was turned over to the

 8     Defense?

 9                    MR. ODDO:  Correct.

10                    THE COURT:  I would suspect you did before Mr. Myer?

11                    MR. ODDO:  I'm sorry?

12                    THE COURT:  Did you have it before you met Mr. Myer?

13                    MR. ODDO:  Yes.  And it was included in our mediation

14     brief.

15                    THE COURT:  Yes.

16                    MR. ODDO:  And the submissions we made.

17                    THE COURT:  Okay.  That concern was addressed in your

18     November motion, the final approval, and you've received no

19     response to that at all, right?

20                    There's no brief in the file.  Haven't heard anything

21     on that issue, just to be very specific.  Has any class member

22     contacted you and said --

23                    MR. ODDO:  No.

24                    THE COURT:  -- hey, by the way, you said it was $325?

25                    MR. ODDO:  No.  And, again, those briefs were posted
```

1    on the Robbins Arroyo website as well as the Epic website.

2              THE COURT:  I'm taking a look at your notice.  I

3    believe, I have a recollection that the notice addressed here -

4    -

5              Mr. Oddo, you said, what I was going to say is, a

6    couple of minutes ago you told me that, am I correct that you

7    calculated approximately $1.57 per unit is what the claimants

8    will get?

9              MR. ODDO:  If all of those claims --

10             THE COURT:  Yes.

11             MR. ODDO:  -- are valid, yes.

12             THE COURT:  Okay.  If I read your notice correctly,

13   which is one point I touched on here, am I reading it correctly

14   that the estimated average recovery for the class is

15   approximately $.50 per Vanguard common unit?  Okay.

16             So, are you, with that reference, I don't remember

17   from the notice hearing, but would that include the $5?

18             MR. ODDO:  No, that would not include the $5.

19             THE COURT:  Okay.  All right.  Nor does the $1.57?

20             MR. ODDO:  Correct.

21             THE COURT:  Okay.

22             MR. ODDO:  That is just based on, after taking out

23   all expenses, include the $80,000 for the $5 payment --

24             THE COURT:  Okay.

25             MR. ODDO:  -- that's the pro rata.

```
 1              THE COURT:  So, for purposes of a prejudice concern,
 2    the argument, typically I look at this and say, whose being
 3    harmed.  The class believes that they may get approximately
 4    $.50 for Vanguard common unit.  What you're telling me is,
 5    today, that based on numbers, what you estimated to be almost
 6    triple, could be over triple that number?
 7              MR. ODDO:  Correct.  Based on --
 8              THE COURT:  Even with $427 number?
 9              MR. ODDO:  Yes.
10              THE COURT:  Correct.
11              MR. ODDO:  $457.
12              THE COURT:  $57, yes, I'm sorry.  $325, $457, okay.
13    Okay.  Anything further on that point?
14              MR. ODDO:  No, I don't think so.
15              THE COURT:  Okay.  Any concern from the Defense, I
16    know it's typically not your problem, but I want to make sure
17    you got the fairness concern.  And what I'm more concerned
18    about is you believe if this is a concern that I should notify
19    the class on any reason, concern that cap is more than, the
20    notice says specifically a cap at $325, but it's going above
21    that.  Any concern from your perspective on objecting later on?
22              MR. LOCHER:  I don't think so, Your Honor, based on a
23    lot of things you have articulated here and recognized.
24              THE COURT:  For the prejudice issue?
25              MR. LOCHER:  Correct.
```

1          MR. CROUGH:  No, Your Honor.

2          THE COURT:  Yes, I think that's what it addresses

3    here.  You are recovering triple what, assuming things work

4    out, you're expecting to recovery triple what you represent

5    what they would get.

6          So, I don't know how anyone would have a prejudice by

7    the fact that, as long as the cost you incurred was work that

8    was done to benefit the class, which it sounds like it was,

9    according to Mr. Myer.  But I will make a note of in the order

10   because I do want to represent the fact that it's a different

11   number than what was represented in the class.  I appreciate

12   your candor on that issue because I was concerned that I was

13   going to have to do a notice on that.

14         Okay.  Other than, I have compared the factors I must

15   use.  I do read, in this case, the 7th circuit decision of

16   Southwest as being helpful.  Southwest Airlines.  In addition

17   to the factors that we use to analyze the reasonableness of the

18   fee.

19         And I have found that the lodestar, with the lodestar

20   check, even if I were to engage in a scrutiny of whether the

21   hourly rates would be appropriate in the District of Delaware,

22   I do find that the lodestar check, even at that stage, would

23   have been appropriate.

24         It is noteworthy that, I put in my order, that most

25   of the work done by the Plaintiff here was done, Plaintiffs

1    Counsel here, was done at an associate level, which I think is

2    appropriate.

3             When we look at the bell curve on this case, and as

4    you know, you presume that, but much of the work was done by

5    associates at, not at your hourly rate, at an hourly rate that

6    would be more appropriate for the kind of work that we would

7    need done.  And so, that's a factor that I do consider,

8    considering the reasonableness of the fee.  Often times I will

9    not approve a fee when it's top heavy.

10            MR. ODDO:  Mr. Carrino did an excellent job on

11   litigating this case.

12            THE COURT:  Well, well done.  Because it's a

13   significant concern that there's a top-heavy feeling.

14   Particularly after cases, it looks like it's getting to

15   settlement.  And so, we are very mindful of that bell curve in

16   the bill.  So I look on the hours you spent on the bell curve.

17            Okay, before I turn to Mr. Hurwitz, anything else you

18   want me to consider for purposes of, I have considered the

19   factors, anything else you want me to consider for purposes of

20   the fee?

21            MR. ODDO:  The only thing I would add is that the 30

22   percent that we're asking for is within the range that was in

23   the retention agreement with Mr. Hurwitz --

24            THE COURT:  Right.

25            MR. ODDO:  -- which was 25 to 33.  We discussed the

1   30 with him and both verbally to myself, and also in his

2   declaration, he fully supports the request for fees along with

3   the settlement itself.

4          THE COURT:  I have asked you this at the preliminary

5   approval, but just confirm it for me, that no part of your

6   percentage of fee or your fee, was discussed with the

7   Defendants as part of accomplishing an $8 million settlement,

8   is that correct?

9          MR. ODDO:  Not at all.  It was never discussed.

10          THE COURT:  All Right.  Okay.  All Right.  All Right,

11   let's talk about Mr. Hurwitz for a moment.

12          His affidavit is helpful.  His declaration.  His

13   experience as an accountant is helpful.  It's the curious thing

14   that he compares his time to an hourly rate as though he's an

15   accountant.  And I have to ask you, you did give me numbers

16   that were higher, relatively higher, but as you well know,

17   that's a relatively high number.

18          I looked in this district candidly for other ones of

19   that size, and I had one.  But I'm the only one.  And I'm

20   asking you, what would justify Mr. Hurwitz, because I have to

21   create some kind of standard, what justifies Hurwitz as opposed

22   to, in your view, opposed to the typical plaintiff, person who

23   brings the case?

24          I've seen these in ten to 12.5 to 15.  Right?  You're

25   double what I would usually look at.

1          MR. ODDO:  Yes.  I think what distinguishes Mr.

2   Hurwitz was that he was fully engaged in the litigation from

3   the outset.  We regularly consulted with him.

4          He sat for deposition, he was appointed as the class

5   representative.  He took that responsibility very seriously.

6   He was, withstood a very rigorous deposition despite the fact

7   that he was, and still is, in somewhat failing health.

8          And I think bringing this type of litigation, which

9   is 14A and Section 11 claims, not many of these are really

10  successful.  And he took a chance on us and was willing to go

11  through the entire litigation and see it through to the end.

12  He was willing despite his health concerns to be here for trial

13  it if went to trial.

14         All those factors combined, I've asked for less and

15  I've asked for more for class representatives in similar

16  circumstances and I think just the fact that he did his job as

17  a class representative, he monitored the counsel, he

18  participated in the litigation and he was appointed class

19  representative.

20         THE COURT:  What you said though, what sounded like

21  what I should direct every class representative to do, it

22  sounds like he was the model class representative in many ways.

23   But give me an example, for example, without telling me

24  something he said.

25         But he says in his affidavit that he authorized or

1   approved or directed you to settle up the $8 million number.

2   Without telling me what he said, was his involvement a two

3   minute phone call or was he actually involved more in that

4   process?

5            I mean, he wasn't with Mr. Myer, was he?

6            MR. ODDO:  No, he was not.

7            THE COURT:  Okay.  So what was his role?

8            MR. ODDO:  So, my communications with him related to

9   the settlement were, I guess, threefold.

10           THE COURT:  Okay.

11           MR. ODDO:  I spoke with him prior to submission of

12   the paperwork to Mr. Myer, to get his approval for what we put

13   into the settlement, or the mediation brief.  Including the

14   demand that was put in there.

15           I had a very frank discussion with him about where we

16   thought this might wind up based on the limited DNO coverage

17   that was available and was going to be present for the

18   mediation.

19           I believe there were at least a couple conversations

20   during the mediation itself, which were, which took the entire

21   day.  I think we concluded past 5 o'clock.

22           And we had a very frank discussion about whether we

23   should accept $8 million.  And I'll be honest with you, he

24   wanted higher.  And it was a very frank discussion about the

25   risk going forward, including the issue related to the

1   bankruptcy.

2          All of the risks that were present and were, had the

3   potential to cause no recovery whatsoever.  Either at summary

4   judgment or after trial.  And it was after the basis of those

5   discussions that he signed off on the $8 million.

6          THE COURT:  Has he, to your knowledge, served either

7   for your firm or for any other firm in this role before?

8          MR. ODDO:  I know he hasn't for my firm.  I believe

9   he has been involved in a couple of other litigations.  Class

10  litigations.

11         But I don't think he was ever, and this came up at

12  his deposition, I don't think he ever was appointed lead

13  Plaintiff.

14         THE COURT:  Okay.

15         MR. ODDO:  So he is not somebody --

16         THE COURT:  So, conversely, all right, accordingly,

17  he has not received, in the past, a representative fee?  To

18  your knowledge.

19         MR. ODDO:  To my knowledge, no.

20         THE COURT:  He testified on that?

21         MR. ODDO:  I believe he did.  I think he was asked

22  about whether, in connection with the other litigations he was

23  involved in, whether he received anything.

24         THE COURT:  Okay.

25         MR. ODDO:  I mean, I'd have to go back and look at,

1    it's been over a year.

2            THE COURT:  And your recollection is he had not?

3            MR. ODDO:  He had not.

4            THE COURT:  Okay.

5            MR. ODDO:  To my recollection.

6            THE COURT:  Testified last November in Boca, right?

7    Yes, it was November 27th that's on his affidavit.

8            MR. ODDO:  Yes.

9            THE COURT:  Okay.  Or something like that.  End of

10   November in Boca.  That's where he lives?

11           MR. ODDO:  Yes.

12           THE COURT:  And so, your recollection is he has not

13   received, in other cases, compensation, other than what a class

14   member would receive?

15           MR. ODDO:  Correct.

16           THE COURT:  Okay.

17           MR. ODDO:  And I don't, you know, based on what he

18   testified to and some of the documents he was shown, he's not

19   somebody who is a frequent litigator.

20           THE COURT:  Right.

21           MR. ODDO:  He hasn't filed claims in courts around

22   the country.  So, he was somebody who was really focused on

23   making sure this litigation was successful.

24           THE COURT:  Anything further on Mr. Hurwitz?

25           MR. ODDO:  Not unless, Your Honor, has any other

1  questions?

2          THE COURT:  No.  Defense, any concern at all, thought

3  about, I know you all agreed not to, I just want to make sure

4  you have anything that's, anything that was raised here today

5  or any questions I may have had, that would give pause to the

6  Defense on anything from Mr. Hurwitz?

7          MR. LOCHER:  We have nothing to add, Your Honor.

8          THE COURT:  Thank you, sir.

9          MR. CROUGH:  Nothing to add.

10          THE COURT:  Okay.  All Right.  Is there anything

11  further, Class Counsel, that you'd like me to consider?  I'm

12  going to take it under advisement.

13          I won't look at a fee issue for a moment.  And that's

14  only this lodestar, this comparative question for myself.  I

15  just want to be comfortable with however I write this.

16          But anything else that you think I should, I've

17  exhausted my concerns, but I want to leave it to you for

18  anything else you wanted to say.

19          MR. ODDO:  I think, as I said from the start, we feel

20  this is a good result for the unit holders that it's an unusual

21  settlement in that the 14A and Section 11 claims don't often

22  get settled in this way with the common fund, so we would ask

23  the Court to grant final approval and to approve the fees and

24  expenses that have been requested.

25          THE COURT:  Is there any further need -- if I close

1    the case, one of the issues that shows up everywhere in these

2    cases is the sort of continuing jurisdiction question.  Is

3    there a need to keep any, the Court has, under its federal

4    authority, is there anything of any particular tentacles that I

5    should be concerned about here?

6              MR. ODDO:  I wouldn't think so.  You know, I've been

7    involved, like I said, in quite a few common fund settlements

8    and the merger context like this, and I don't recall us ever

9    having to go back to the court with an issue related to the

10   claim's administration or any other issue.

11             THE COURT:  Okay.

12             MR. ODDO:  I think it's more of a cautionary status

13   so that if something does arise and a unit holder, for whatever

14   reason has a concern about what they received or maybe that

15   their claim was invalidated, that they have a venue to raise

16   that.  But that's never happened in my experience.

17             THE COURT:  Okay.  All Right.  Defense, anything

18   further for you, sir?

19             MR. LOCHER:  No, Your Honor.  Thank you.

20             THE COURT:  Anything further?

21             MR. CROUGH:  No, Your Honor.

22             THE COURT:  Okay.  All Right, I'm going to take it

23   under advisement to issue a final approval.  I do find the, as

24   I found before, that the service provided here, by all counts,

25   was at the appropriate level.

1        Certainly, the kind of Counsel, the kind of efforts

2   that we would expect from a case involving these types of

3   issues.  It was, in many ways, a difficult burden for both

4   sides.

5        And I found the case was well presented.  And it

6   would have gone to trial.  In fact, as of right now, until I

7   rule something, it is still scheduled for trial.

8        So, I appreciate the attention that each of you

9   placed to your client's concerns.  And concerns of the Court to

10  make sure we appropriately move this along for everybody's

11  benefit.

12       So, we will adjourn and take it under advisement.  An

13  order will be entered.  But again, I appreciate, on behalf of

14  the Court, I appreciate your diligence in this matter in

15  getting it resolved.  Thank you very much.  Best wishes for the

16  holidays.

17       MR. LOCHER:  Okay, thank you, Your Honor.

18                         * * * * *

19

20

21

22

23

C E R T I F I C A T E

I, court approved transcriber, certify that
the foregoing is a correct transcript from the
official electronic sound recording of the proceedings
in the above-entitled matter.


_____          September 9, 2019
    Neal R. Gross

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS

1323 RHODE ISLAND AVE., N.W.

(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com